LEWIS, J.
In his final remarks to the jury, Atticus Finch, the heroic protagonist of Harper Lee’s iconic novel, To Kill a Mockingbird, proclaims
I’m no idealist to believe firmly in the integrity of our courts and in the jury system — -that is no ideal to me, it is a living, working reality. Gentlemen, a court is no better than each man of you sitting before me on this jury. A court is only as sound as its jury, and a jury is only as sound as the men who make it up.
Harper Lee, To Kill a Mockingbird, 205 (Warner Books, Inc., 1960). The case before us today addresses the very heart in which Atticus’s faith roots — -the integrity of our courts, the soundness of our juries, and the men and women who “make [them] up.” Id. The petitioner, Rafael Ma-tarranz, seeks review of the decision of the Third District Court of Appeal in Matarranz v. State, 99 So.3d 534 (Fla. 3d DCA 2011), in which he alleges a violation of his due process rights occurred because his trial was not conducted before a fair and impartial tribunal of his peers. We have jurisdiction on the basis that the decision of the Third District expressly and directly conflicts with the decision of the Fourth District Court of Appeal in Huber v. State, 669 So.2d 1079 (Fla. 4th DCA 1996), on a question of law. See art. V, § 3(b)(3), Fla. Const.
Maintaining the sanctity of the jury trial is both critical and integral to the preservation of a fair and honest judicial system. It is also significant to the trust and confidence our citizens place in the judicial system. “The jury is an essential instrumentality — an appendage — of the *477 court, the body ordained to pass upon guilt or innocence.” Sinclair v. U.S., 279 U.S. 749, 765, 49 S.Ct. 471, 73 L.Ed. 938 (1929). Without the “[e]xercise of calm and informed judgment” by the jury, we cannot expect “proper enforcement of law.” Id. Consequently, a failure to ensure that our jury panels are comprised of only fair and impartial members renders suspect any verdict reached.
Matarranz, who was found guilty of first-degree murder and burglary, Matarranz, 99 So.3d at 534-35, alleges that the trial court’s failure to remove a prospective juror (the Juror) for cause resulted in a denial of his right to a fair and impartial jury as guaranteed by article 1, section 16, of the Florida Constitution and the Sixth and Fourteenth Amendments to the United States Constitution. The Third District disagreed with Matarranz and affirmed the decision of the trial court because the district court agreed that the Juror was competent to serve. See id. at 535.
Upon review, however, we disagree with the court below and hold that the Juror demonstrated that she could not fulfill her role as a fair and impartial arbiter and thus she should have been excused for cause. Accordingly, we quash the decision of the Third District, remand this case for a new trial, and clarify the law surrounding peremptory challenges and the removal of jurors for cause.
FACTS
The entirety of the interactions between the trial court, the prosecutor, the defense, and the Juror are excerpted below.[1] The trial court began voir dire by providing prospective jurors with a general overview of criminal trial procedures and stating the charges against the defendant. The trial court then asked whether any of the charges “makes any of you [prospective jurors] think that you just could not be a fair juror....” Along with other jurors, the Juror raised her hand and responded that she could not be a fair juror because of reservations she held with regard to the defendant’s burglary charge.
Later, the trial court initiated questioning with the Juror and the following exchange transpired:
THE COURT: [Juror], I wanted to follow-up with you. You had answered a question about the fact that this is a burglary case and it had to do with whether or not you thought you could be a fair juror in this case. Tell me what you are thinking.
JUROR: It is just from past experiences. I have been the victim of burglaries like my house when I was younger and also I wrote down that my cousin was a victim of fraud and like trying to cash fake checks and it wasn’t really his fault and everything that happened with that and how it affected my family, that still affected me and I hold a grudge on that and he was pretty much fleeing from whoever that guy was taking checks on and my cousin was the unfortunate one that happened to cash it and that stayed on his record and it is something that I hold against him. How it affected me, my parents and my whole family. I don’t think I could be fair against [Matarranz] because I hold that grudge.
THE COURT: The grudge that you hold is against someone who violates the law?
JUROR: Right.
THE COURT: But the law holds a grudge on people who violate the law *478 once a person is convicted of violating the law, if a person is convicted and it is in my division, it is my job to sentence the victim but I hear what you are saying, but I want to make sure that you understand that this trial would not be about whether or not it is okay to have a grudge against people who commit crimes. The question is going to be was a crime committed and if it was committed whether Mr. Matarranz is the one that committed it; you understand that?
JUROR: Yes.
THE COURT: Well, for example you told me it was your brother?
JUROR: My cousin.
THE COURT: Who was cashing checks and he ended up getting accused of something that he in fact didn’t do?
JUROR: Yes. He had no idea about it.
THE COURT: So, you don’t hold a grudge against people who are accused of something that they didn’t do?
JUROR: No. It is just — I don’t know how it affected like — I don’t know — it is something that just stays there. I know how it affected us and how everything happened. It was during the holiday season and it was just crazy and it just makes me sad about it and it brings back bad memories.
THE COURT: And I thank you and when you have the bad memories come back since you are approaching the holidays and this is going to be a burglary case, when you look over at these two tables which way does your judgment go, if you feel like you have one?
JUROR: Towards him.
THE COURT: And you are indicating towards the defense table?
JUROR: Yeah.
THE COURT: Let me ask the lawyers, if they have any questions?
PROSECUTOR: You have not heard any evidence yet with regard to Mr. Matarranz, right?
JUROR: Yes.
PROSECUTOR: Are you able to listen to the testimony and the evidence in this case with an opened mind?
JUROR: I could have an open mind about it, but it is still — knowing myself I think I would lean more towards the State of Florida just because I don’t think that it is right for someone to come in and take something that someone worked so hard for and take their life away from that person.
PROSECUTOR: Can you follow the judge’s law and the law in the State of Florida and say I know that I favor the defendant, because he looks like a family member or I favor the State because I want to be a State Attorney when I grow up. The question is, can you follow the law and not say I’m going to be more for the defendant or more for the State and just sit here and listen to the evidence and make the State prove our case beyond a reasonable doubt, because that is what we have to do?
JUROR: Yes.
PROSECUTOR: So my question is, can you do that even though you may feel more sympathetic particular towards one side or the other. Can you put aside your feelings and sit here with an open mind and see whether or not the State of Florida at the end of the case has proved the charges of murder in the first degree against the defendant, can you do that honestly?
JUROR: Yes, I think I could. Just like you say maybe I would lean a little more to one side, but I would have to hear everything before I can actually make a decision.
*479 PROSECUTOR: You can’t lean. That is what you are saying when you say I think you are going to make the State nervous ... and you are going to make [defense counsel] nervous. You can’t say I think. My question, can you put aside your feelings for the State or the feelings for the defendant, put them aside if you are selected as a juror and listen to the evidence that comes forward on the case and make a determination at the conclusion of all the evidence as to whether or not the State of Florida has proved these two charges against the defendant. Can you do that, honestly?
JUROR: Yes.
THE COURT: Thank you....
DEFENSE COUNSEL: I’m confused. I’m sorry.... You started telling your honor that you couldn’t do what you just told the prosecutor that you are going to do.
JUROR: I can put it aside but, it is just that with my past experiences — I have an old mind in all things and I know that I can do it. It is just that I rather not, just because — I mean, put it aside, but I can have an open mind and put all my feelings aside....
DEFENSE COUNSEL: Are those feelings going to make it easier for the State to secure a conviction against Mr. Matarranz, if you sit as a juror in this case?
JUROR: I would have to hear — like I would have to hear the whole thing.
DEFENSE COUNSEL: What are you going to require me to do?
PROSECUTOR: Judge, I’m going to object.
THE COURT: Sustained....
DEFENSE COUNSEL: These feelings that you have right [ ] now that you are leaning towards the State because of your prior experiences, would you explain those prior experiences, please.
JUROR: No prior experience, just like I explained to the judge, I had a cousin.
DEFENSE COUNSEL: Tell me about the burglary?
JUROR: The burglary was when I was younger, someone broke into my house it was on Christmas day, they stole everything and they — it is not easy for me like, an eight year old come into my house, knowing all of my presents are gone and everything that my parents worked so hard for is now gone.
DEFENSE COUNSEL: And it still brings back bad memories as you think about it now.
JUROR: Sometimes. It has gotten easier. They have been moments that I don’t even think about it, but sometimes when something comes up I think a lot of it.
DEFENSE COUNSEL: Did you start thinking about it as soon as your honor told you that one of the charges w[as] burglary?
JUROR: Yes.
DEFENSE COUNSEL: Can you tell me what you started thinking about as soon as you heard that it was a burglary?
JUROR: Just me walking in my house and knowing that everything that my parents worked extremely hard for is now not there and now they have to work harder again to move on forward then that....
DEFENSE COUNSEL: Do you think those experiences that you have and those experiences that you are remembering today, do you think that they are going to affect you as you deliberate and make the decision whether or not Mr. Matarranz is guilty of the *480 charge of burglary and the charge of murder.
JUROR: No, ’cause I would have to hear it. I don’t think so.
The next day, the Juror was questioned again by the prosecutor and defense counsel.
PROSECUTOR: [Juror], same questions to you. You kind of went back and forth and I want to ask you, if you can promise that you will not hold it against the defendant because he doesn’t have a burden, if he decides not to testify or if they decide not to put on witnesses, are you okay with that?
JUROR: Yes.
PROSECUTOR: And you understand that it is the State’s burden to prove him guilty beyond and to the exclusion of every reasonable doubt?
JUROR: Yes.
PROSECUTOR: And do you understand that they do not have the burden to do anything?
JUROR: Yes.
PROSECUTOR: The bottom line is, you may want to hear, can you follow the law that they do not have to do anything in this case?
JUROR: Yes.
PROSECUTOR: And hold the State to its burden?
JUROR: Yes....
[[Image here]]
DEFENSE COUNSEL: As we are sitting here today, have you been thinking about what we talked about yesterday?
JUROR: And I talked about it and I have a more opened mind about it and I gave a thought and I have opened mind and that anything that happened to me in the past has nothing to do with this case.
DEFENSE COUNSEL: Would you like Mr. Matarranz to testify?
JUROR: It doesn’t matter. It depends on the evidence whether he is guilty or not. As of right now he is innocent because there is nothing presented to me that proves otherwise.
DEFENSE COUNSEL: Have you ever heard of somebody that did something but in real[i]ty he didn’t do it?
JUROR: No.
DEFENSE COUNSEL: What do you think about it?
JUROR: It depends on the evidence that is there because words are just words.
DEFENSE COUNSEL: Are you opened to the possibility that somebody would say that he did something very terrible, very bad which in fact he didn’t? ... Are you opened to the possibility that somebody may admit to doing something terrible where in fact he didn’t do that?
JUROR: Yes.
Later, the trial court, prosecutor, and defense counsel discussed which prospective jurors they believed should remain on the panel. When the trial court asked defense counsel whether he wanted to use a peremptory challenge to strike the Juror, the following dialogue transpired:
DEFENSE COUNSEL: We move to strike [the Juror] for cause yesterday. She essentially said she would hold a grudge against people who violate the law and people who steal and this was based upon her previous victimized — the fact that she was previously the victim of burglary. She has a grudge toward the defendant. She leans towards the State and I think she even said multiple times, originally she said that she had a problem with the charges when your honor asked her if she could be fair and *481 impartial, she said to both, even though today she kind of backtracked a little bit, she said she now has more of an opened mind. It is clear that this is a woman or a juror who could not be fair and impartial beyond a reasonable doubt that being the standard we move to strike her for cause.
THE COURT: I’m going to deny the cause challenge. Having only had heard testimony from yesterday, I would have been inclined to grant it, but her testimony yesterday includes the fact that there had been this burglary when she was eight years old, that was emotional for her because it included the theft of her Christmas toys and today based on her demeanor, I believe from her reflection, I think she was embarrassed and she said that she thought about it last night and she said that she felt that she had more of an opened mind today and that she could be fair and she realized that that burglary that happened to her had nothing to do with this case. So, for those reasons I’m going to deny the cause challenge; do you wish to exercise a peremptory?
(Emphasis supplied.) Later, defense counsel was forced to use his sixth peremptory challenge to strike the Juror.
After defense counsel exhausted his tenth and final peremptory challenge, defense counsel stated that the trial court had erred because five of the ten jurors he had removed peremptorily should have been removed for cause. Defense counsel listed these jurors by name. The Juror at issue in this case was not included in defense counsel’s list.[2] Defense counsel then requested an additional peremptory challenge. After listing the jurors whom defense counsel contended should have been removed for cause (rather than with peremptory strikes), counsel listed one juror he would strike if granted an extra peremptory challenge in addition to four other jurors.[3] The trial court denied the request for an additional peremptory challenge. According to the opinion of the Third District, one of these “objectionable” jurors sat on the jury. See id. at 538.[4] Before the jury was sworn, defense counsel renewed “all our motions and objections and challenges previously made.” Following the jury trial, Matarranz was found guilty of first-degree murder and burglary. Id. at 534-35.
On appeal, the Third District affirmed Matarranz’s convictions but wrote specifically to address the trial court’s denial of a challenge for cause against the Juror. See generally id. The district court concluded that, after having conducted a “thorough review of the record,” the trial court did not commit manifest error when it determined that the Juror was competent to *482 serve. Id. at 539. The district court stated that the Juror consistently indicated:
1) she would not hold it against Mr. Matarranz if he did not testify or if the defense did not present witnesses;
2) she understood that it was the State’s burden to prove Mr. Matarranz’s guilt beyond a reasonable doubt;
3) Mr. Matarranz did not have any burden of proof; and
4) she would hold the State to its burden of proof based on the evidence presented.
Id. Additionally, the Third District identified that the Juror had stated “anything that happened to me in the past has nothing to do with this case.” Id.
This Court granted review of the Third District’s decision based on conflict with the decision in Huber, in which the Fourth District held that the trial court erred when it refused to dismiss a prospective juror for cause who originally expressed doubt regarding whether he could presume the defendant was innocent and follow the law. See Huber, 669 So.2d at 1082-83.
ANALYSIS

PRESERVATION

Matarranz contends that the Third District erred when it affirmed the trial court’s denial of his challenge for cause to the Juror. Matarranz alleges that the Juror’s responses during voir dire demonstrate her bias toward Matarranz and in favor of the State. In addition to disputing the merits of this claim, the State contends that Matarranz did not preserve it for review. As explained below, we disagree.
In Kearse v. State, this Court held that to preserve challenges for cause to prospective jurors, the defendant must “object to the jurors, show that he or she has exhausted all peremptory challenges and requested more that were denied, and identify a specific juror that he or she would have excused if possible.” 770 So.2d 1119, 1128 (Fla.2000); see also Trotter v. State, 576 So.2d 691, 693 (Fla.1990); Hill v. State, 477 So.2d 553, 556 (Fla.1985). As this Court explained in Carratelli v. State, “[b]y not renewing the objection prior to the jury being sworn, it is presumed that the objecting party abandoned any prior objection he or she may have had and was satisfied with the selected jury.” 961 So.2d 312, 318 (Fla.2007) (quoting Zack v. State, 911 So.2d 1190, 1204 (Fla.2005)). A court errs when it “force[s] a party to exhaust his peremptory challenges on persons who should have been excused for cause.... ” Leon v. State, 396 So.2d 203, 205 (Fla. 3d DCA 1981); see also Hill, 477 So.2d at 556.
Carratelli and related case law demonstrate that it is the objection/re-objection process — not the re-listing of specific, individual, and previously objected-to jurors — that is the decisive element in a juror-objection-preservation analysis. See Carratelli, 961 So.2d at 318; Kearse, 770 So.2d at 1128; Joiner v. State, 618 So.2d 174, 176 (Fla.1993). For example, in Joiner, this Court held that the district court properly concluded the defendant had not preserved his earlier objection to the composition of the jury because counsel had later accepted the panel without objection. See Joiner, 618 So.2d at 176. In so ruling, this Court stated:
It is reasonable to conclude that events occurring subsequent to his objection caused him to be satisfied with the jury about to be sworn. We therefore approve the district court to the extent that the court held that Joiner waived his ... objection when he accepted the jury. Had Joiner renewed his objection *483 or accepted the jury subject to his earlier ... objection, we would rule otherwise. Such action would have apprised the trial judge that Joiner still believed reversible error had occurred. At that point the trial judge could have exercised discretion to either recall the challenged juror for service on the panel, strike the entire panel and begin anew, or stand by the earlier ruling.
Id. (footnote omitted). Once counsel has noted that he or she would strike a specific juror for cause, and again renews that objection before the jury is sworn, counsel has accomplished the purpose which underlies the Carratelli logic: to provide a trial court with notice that counsel believes a juror has been retained in error, and to provide the court with a final opportunity to redress the situation. See Joiner, 618 So.2d at 176.
Additionally, after moving to strike a juror for cause, precedent does not reflect that counsel is required to again list the juror by specific name a second time who should have been initially removed for cause, but was not. Although the question of preservation in this case would have been a non-issue had counsel simply identified the Juror by specific name a second time prior to swearing in, precedent reflects only that counsel must identify “a” specific juror whom counsel would have excused with an additional challenge. See Kearse, 770 So.2d at 1128 (“In order to preserve [a challenge for cause] for appeal, Florida law requires a defendant to ... identify a specific juror that he or she would have excused if possible.” (emphasis supplied)); see also Dillbeck v. State, 643 So.2d 1027, 1028 (Fla.1994).
Here, defense counsel moved to strike the Juror for cause after engaging in a thorough discussion with her regarding her capacity to be fair and impartial. The trial court denied this request. Thereafter, counsel was forced to use a peremptory challenge to strike this Juror. After already removing the Juror peremptorily, counsel did not need to then specifically identify her again as objectionable for cause (as he had earlier) to preserve the challenge. Counsel met the requirements of preservation by exhausting all of his peremptory challenges and then specifically identifying and listing jurors he would have excused if provided with an additional challenge.
Given that the requirements of preservation were satisfied, Matarranz would suffer a violation of his due process rights if the Juror should have been, but was not, removed for cause. “Florida ... adhere[s] to the general rule that it is reversible error for a court to force a party to use peremptory challenges on persons who should have been excused for cause, provided the party subsequently exhausts all of his or her peremptory challenges and an additional challenge is sought and denied.” Hill, 477 So.2d at 556. “The value of peremptory challenges is that they are intended and can be used when defense counsel cannot surmount the standard for a cause challenge.” Busby v. State, 894 So.2d 88, 100 (Fla.2004). This value is destroyed if counsel is forced to use a peremptory challenge on a juror who should have been removed for cause. See Hill, 477 So.2d at 556 (noting that “such error cannot be harmless because it abridged appellant’s right to peremptory challenges by reducing the number of those challenges available [to] him”); cf. Pentecost v. State, 545 So.2d 861, 863 n. 1 (Fla.1989) (holding that the defendant did not suffer prejudice because he had “numerous peremptory challenges remaining, but chose not to exercise any on [the contested jurors]”).
Defense counsel exhausted all of his peremptory challenges, sought additional chai- *484 lenges, and the trial court denied the request. The trial court was on notice that defense counsel was dissatisfied with the jury panel due to counsel’s objection at the time the jury was sworn. Therefore, we hold that this claim was preserved for review and now analyze it to evaluate whether Matarranz suffered a violation of his due process right to a fair and impartial jury.

STANDARD OF REVIEW

The question of the competency of a challenged juror is “one of mixed law and fact to be determined by the trial judge in his [or her] discretion. This decision will not be disturbed unless error is manifest.” Singer v. State, 109 So.2d 7, 22 (Fla.1959); see also Carratelli, 961 So.2d at 319 (noting that appellate courts review “the trial court’s discretionary decision for manifest error”). When evaluating a juror’s competency, an appellate court must keep in mind that “the question is not whether a reviewing court might disagree with the trial court’s findings, but whether those findings are fairly supported by the record.” Trotter, 576 So.2d at 694; see also Carratelli, 961 So.2d at 319.

JUROR BIAS

In Singer, this Court articulated the applicable rule to evaluate whether a trial court’s denial of a challenge for cause constitutes reversible error:
[I]f there is basis for any reasonable doubt as to any juror’s possessing that state of mind which will enable him to render an impartial verdict based solely on the evidence submitted and the law announced at the trial, he should be excused on motion of a party, or by the court on its own motion.
Singer, 109 So.2d at 23-24; see also Banks, 46 So.3d at 995; Kopsho v. State, 959 So.2d 168, 170 (Fla.2007) (“A juror must be excused for cause if any reasonable doubt exists as to whether the juror possesses an impartial state of mind.”); Hamilton v. State, 547 So.2d 630, 632 (Fla.1989). We have also held that if error is to be committed, let it be in favor of the absolute impartiality and purity of the jurors’ — which is interpreted to mean that the mind of the proposed juror should not contain any element of prejudice for or against either party in a cause to be tried before him. Johnson v. Reynolds, 97 Fla. 591, 121 So. 793, 796 (1929) (quoting Temples v. C. of Ga. Ry. Co., 15 Ga.App. 115, 82 S.E. 777, 779 (1914) (citation omitted)).
Trial courts are endowed with the responsibility to determine that jurors render a verdict solely on the evidence presented and the law given by the court. Banks, 46 So.3d at 995; Hamilton, 547 So.2d at 633; Lusk v. State, 446 So.2d 1038, 1041 (Fla.1984). It is evidence and facts, not emotions or passions, that must inform a juror’s decision. A trial court’s determination of whether a juror can render a verdict based on the evidence presented involves an evaluation of “all of the questions and answers posed to or received from the juror.” Banks, 46 So.3d at 995 (quoting Parker v. State, 641 So.2d 369, 373 (Fla.1994)); see also Johnson v. State, 969 So.2d 938, 946 (Fla.2007). Although a juror’s assurances of impartiality may suggest to a court that the denial of a challenge for cause may be appropriate, see Banks, 46 So.3d at 995, such assurances are neither determinative nor definitive, see Murphy v. Florida, 421 U.S. 794, 800, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). See also Overton v. State, 801 So.2d 877, 892 (Fla.2001) (holding that a juror’s assurances were insufficient to persuade this Court as to the juror’s impartiality); Singer, 109 So.2d at 24 (“a juror’s statement that he [or she] can and will return a verdict according to the evidence submit *485 ted and the law announced at trial is not determinative of his [or her] competence .... ”). Assurances of impartiality after a proposed juror has announced prejudice is questionable at best.
This Court is keenly aware of the unique biases, prejudices, predilections, predispositions, and viewpoints that each of us possesses and that cannot be altered or undone by the court or counsel over the course of voir dire. These proclivities may be neither wrong nor perverse. Rather, they are realities of human nature, and their existence underscores the logic upon which our judicial system provides courts with the power to remove prospective jurors for cause. In Reynolds, we recognized these realities of human nature when we reversed the lower court’s decision not to remove a juror for cause who acknowledged personal bias, but also appeared to reject that sentiment over the course of voir dire. See Reynolds, 121 So. at 796. In that case, the prospective juror stated to the court that he was concerned about his ability to render a fair and impartial verdict because of his “friendly relations” with the plaintiffs’ attorney, and that it “would embarrass him to render a verdict against the plaintiffs.” Id. Although the prospective juror later conceded that he would be able to decide the case in accordance with the evidence presented, we held that this concession provided insufficient support to justify the court’s conclusion that the juror was competent to serve. See id. We found it
difficult, if not impossible, to understand the reasoning which leads to the conclusion that a person stands free of bias or prejudice who having voluntarily and emphatically asserted its existence in his mind, in the next moment under skillful questioning declares his freedom from its influence. By what sort of principle is it to be determined that the last statement of the man is better and more worthy of belief than the former?

Id.

In O’Connor v. State, this Court emphasized its commitment to juror impartiality when it noted that “jurors should if possible be not only impartial, but beyond even the suspicion of partiality.” 9 Fla. 215, 222 (Fla.1860). The goal sought is
a jury composed of persons whose minds are free of any preconceived opinions of the guilt or innocence of an accused, persons who can in fact give to an accused the full benefit of the presumption of innocence, persons who can because of freedom from knowledge of the cause decide it solely on the evidence submitted and the law announced at the trial.
Singer, 109 So.2d at 28.
Over the years, trial court discretion with regard to the removal of compromised jurors has at times become so broad that our courts have lost sight of the principles of law that undergird juror-qualification determinations. This, however, need not be the case. Partialities, biases, prejudices, and misconceptions are not all of one character and can be distinguished as prohibitive or non-prohibitive to jury service. Today we clarify the law to delineate this distinction.
Trial courts and counsel regularly find themselves addressing prospective jurors who maintain fixed opinions and firmly held beliefs based on personal life experiences. Such opinions and beliefs are defining qualities of these individuals. At least with regard to whether a prospective juror is unfit to serve given the circumscribed time frame provided by voir dire, we recognize opinions and biases that arise from these circumstances as immutable. However, courts and counsel also find themselves addressing jurors who misun *486 derstand aspects of the law and the judicial process. These misunderstandings are based not on personal experience and beliefs, but on a lack of familiarity with or misinformation concerning the law. We clarify today that courts and counsel are correct to engage prospective jurors in a dialogue addressing their partialities, biases, prejudices, and misconceptions when they are rooted in a lack of familiarity with the judicial system as part of an effort to rehabilitate in contrast to those immutable opinions and attitudes that arise from personal life experiences and firmly held beliefs. Florida law “allows ‘the rehabilitation of jurors whose responses in voir dire raise concerns about their impartiality.’” Rimes v. State, 993 So.2d 1132, 1134 (Fla. 5th DCA 2008) (quoting Juede v. State, 837 So.2d 1114, 1115 (Fla. 4th DCA 2003)). Concerns that stem from misinformation and confusion concerning the law or process are ripe for discussion and redress through rehabilitation.
In Overton, this Court addressed a denial of a challenge for cause against a prospective juror, and, in so doing, implicitly addressed when it is and is not appropriate to retain a juror who manifests particular biases with regard to the death penalty. See 801 So.2d at 889-95. In Overton, Juror Russell admitted multiple times during voir dire that he “always believed” that when individuals do not “take the stand ... they’ve got something to hide.” Id. at 891-92 (emphasis supplied). However, Juror Russell also asserted that he could “shut that [belief] out” if he was selected to serve. Id. at 892. Given the totality of responses, we concluded that Juror Russell’s assurance was insufficient to negate his pronouncement that a decision not to testify suggested a consciousness of guilt, and, therefore, we held that he should have been removed for cause. See id. at 893.
In contrast, in the same case, we did not find error in the trial court’s refusal to excuse Juror Heuslein who “note[d] that he favored the death penalty,” but, as voir dire proceeded and counsel explained the capital sentencing scheme, ultimately “expressed a ‘great deference’ to the trial court’s instructions, ... that he would ‘start from a clean slate,’ ” and would “follow the law.” Id. at 894 (emphasis supplied). Juror Heuslein also indicated that he could consider a life recommendation even if the jury found the defendant guilty of first-degree murder. See id. Based on the record, we held that the trial court did not abuse its discretion when it denied a challenge for cause to Juror Heuslein. See id.
Our decision in Overton to affirm the trial court’s ruling as to Juror Heus-lein, but not Juror Russell, reflects discernment between those viewpoints that stem from firmly held beliefs that will not be altered during voir dire through dialogue with the court and counsel, and those opinions that are open to exploration and modification. We understand that “[i]t may be quite easy for either the State or the defense to elicit strong responses that jurors would genuinely reconsider once they are instructed on their legal duties and the niceties of the law.” Id. at 894 (quoting Johnson v. State, 660 So.2d 637, 644 (Fla.1995)). “[J]urors brought into court face a confusing array of procedures and terminology they may little understand at the point of voir dire.” Id. (quoting Johnson, 660 So.2d at 644). Prospective jurors may be “overwhelmingly unaware” of the varied trial procedures and processes they will confront in a given case. Id. at 893 (discussing jurors’ lack of familiarity with the “bifurcated process” in a death case). Therefore, it is necessary for courts to distinguish between those biases and beliefs that define a prospective *487 juror — and thus produce little if any actual change in him or her from intensive questioning — and those in which information and explanation may provide a prospective juror with the “requisite familiarity” and insight into the judicial process that will render him or her competent to serve.
It was a type and degree of equivocation similar to that in the case currently before this Court that led us to hold in Hamilton that a contested juror did not exhibit the “requisite impartial state of mind necessary to render a fair verdict, and thus should have been dismissed from the jury pool.” Hamilton, 547 So.2d at 633; see also Trotter, 576 So.2d at 694 (holding that the prospective juror’s equivocal responses, though ultimately followed with affirmations of impartiality, did not provide support for this Court to reject the trial court’s removal of a juror for cause). In Hamilton, a juror stated that she would require evidence presented by the defendant to convince her that the defendant was not guilty. Hamilton, 547 So.2d at 632. That same juror also “eventually stated that she could base her verdict on the evidence at trial and the law as instructed by the court.” Id. Although we recognized that the juror stated she would be able to evaluate the case with an open mind, “her other responses raised doubt as to whether she could be unbiased.” Id. at 633. Consequently, we determined that the trial court erred in retaining her for the jury and that the failure to excuse her “deprived [the defendant] of his constitutional right to a fair trial.” Id. Accordingly, we reversed the conviction and remanded the case for a new trial. See id.
Similarly, in Hill, this Court rejected the determination of the trial court that a contested juror possessed the requisite state of mind and, consequently, held that the juror at issue should have been dismissed for cause because of preconceived opinions as to the guilt or innocence of those charged with the crimes. Hill, 477 So.2d at 555-56. We noted that when the trial court asked whether the juror would allow preconceived opinions to control his decision, he replied, “ ‘That’s a hard decision to make right now. I think I can say I can. I don’t know for sure.’ ” Id. at 555. When defense counsel asked how he would prevent his opinions from affecting his deliberations, the juror responded:
Well, basically, like I said, I have not associated that opinion with [the defendant]. It was just a blank feeling that ... someone that shoots someone else should be punished.... I feel anyone that shoots anyone else in the type of incident as much as I know about it now, the death penalty should be imposed upon them. That’s basically what I felt at the time.
Id. (emphasis omitted). Later, with regard to the juror’s feelings on the death penalty, the following dialogue transpired:
DEFENSE COUNSEL: Do you feel like from under the facts that you know now, do you feel like this might be an appropriate case [to impose the death penalty]?
JUROR: I don’t feel I have really been given any more facts than I have before coming into the courtroom.
DEFENSE COUNSEL: You formed an opinion before though?
JUROR: Yes, sir.
DEFENSE COUNSEL: Have you discarded that opinion?
JUROR: Not necessarily.
DEFENSE COUNSEL: Do you feel that in all cases of premeditated murder that the death penalty should be applied?
JUROR: It’s a hard question to answer.
*488 DEFENSE COUNSEL: Yes, sir, sure is.
JUROR: I’m not saying in all eases, [it’s] dependent upon the evidence.
DEFENSE COUNSEL: Are you still inclined towards the death penalty in this case if in fact there is a conviction?
JUROR: Yes, sir.
DEFENSE COUNSEL: That’s the presumption that you came into this court with?
JUROR: Yes, sir.
Id. In reversing the refusal by the trial court to strike this juror for cause, we concluded that discretion was not even at issue because the trial court simply had “failed to apply the rules of law set forth in Singer.” Id. at 556.
The above analysis, coupled with our articulation of a test to distinguish between biases that render an otherwise objectionable juror competent to serve highlight that our holding today does not constitute, as the dissent contends, “a fundamental alteration of the established structure for the disqualification of jurors for bias ... [that is] radically flawed.” Dissenting op. at 488. Rather, today we offer a crystallization and clarification of the rules and procedures that already define the voir dire process. Our ruling provides a formulaic framework for the trial courts to employ when rendering decisions with regard to juror fitness to serve. The only “radical” element with regard to the opinions issued in this case is the dissent’s implicit admission that it would have our courts empanel biased and compromised jurors rather than adhere to the principle that our courts empanel only fair and impartial jurors. Our ruling today is not one of sacrificing justice for judicial expediency as the dissent would hold; to the contrary, it furthers a much more important and sacred objective: to protect and safeguard the rights of all those who participate in the judicial process and to enhance trust and confidence in that process.
Although uttered “with all due respect,” the dissent incorrectly asserts that our decision today rebuffs the notion that “human beings can learn and ... change” and characterizes our conclusion regarding relatively instantaneous opinion changes by jurors during voir dire as an affront to “human experience.” Dissenting op. at 493. Not only does the position of the dissent overrule clear precedent of this Court, see Reynolds, 121 So. at 796, but it draws an even more preposterous conclusion that “the human capacity for rational reflection,” Dissenting op. at 493, is but a light switch that can be flipped on or off, and a trial court may thereby procure a juror who mere minutes before expressed unacceptable bias and partiality, is suddenly objective and neutral such that we, as members of the judiciary and servants of the public, can maintain the requisite degree of confidence in our legal system to attest to its integrity and fairness. To the extent that members of this Court “depart” from our framework for determining juror bias, see Dissenting op. at 493, it is the dissent which today compromises our efforts to safeguard and defend one of the great bulwarks of democracy — fair juries.
As was the case in Hill, in the present case the trial court simply failed to apply Singer’s rule of law, which provides that if there is a reasonable basis to doubt a juror’s impartiality, then that juror should be excused. See Hill, 477 So.2d at 555-56. Notwithstanding “tortured attempts at rehabilitation,” the totality of the Juror’s responses in this case sufficiently placed in doubt her ability to be impartial. Overton, 801 So.2d at 893.
*489 The true test of the fixedness of an opinion in the mind of a juror is not whether the opinion will readily yield to the evidence. Singer, 109 So.2d at 24. The accused is not required to present evidence of innocence. Id. “The accused, guilty or innocent, is entitled to the presumption of innocence in the mind of every juror until every element of the offense charged against him [or her] has been proved.... ” Id. (quoting Powell v. State, 131 Fla. 254, 175 So. 213, 216 (1937)); Smith v. State, 463 So.2d 542, 545 (Fla. 5th DCA 1985). The test is whether the juror possesses the state of mind necessary to render a verdict in accordance with the evidence and not based upon preconceived opinions. Moreover, if an individual takes the additional step of admitting concern that he or she may be biased, an expression of such sentiment must necessarily inform a court’s analysis of juror partiality. See Singer, 109 So.2d at 24.
In the case currently before us, not only did the Juror admit to the trial court while describing an upsetting incident in her life that she believed she was biased in favor of the State, it appears that the court may have “embarrassed” her into rejecting her expressed sentiments. A court should assess a juror’s ability to be fair and impartial based on the genuineness of his or her statements, not on whether the juror has reached a sufficient level of discomfort to reject or conceal genuinely-held feelings. Here, the trial court’s own observations support the conclusion that the Juror rejected her earlier admissions based on embarrassment, which does not thereby establish her impartiality or competence to serve. Matar-ranz’s right to a fair and impartial jury was thus compromised by the failure of the trial court to excuse her for cause.
As evidenced in the transcript of the voir dire, the Juror identified herself when the trial court asked if anyone thought he or she could not be a fair juror. She explained that because her family’s home was burglarized during Christmas when she was eight years old, and because one of her family members had been a victim of fraud, she was concerned she would be biased against the defendant. Among other charges, Matarranz was charged with burglary, and the trial was scheduled to occur during the holiday season.
The Juror explained to the trial court that even at the present moment, when she reflected on the Christmas burglary, she was saddened and, because she did not think “it [wa]s right for someone to come in and take something that someone worked so hard for ...,” she would favor the State in Matarranz’s case. When questioned further as to whether she could set aside her negative feelings and listen to the evidence presented by the prosecutor and defense counsel, the Juror responded that she believed she could, but that she had “an old mind in all things” and that she would prefer not to be forced to do so.
Before her final day of voir dire, the Juror consistently answered questions as to whether she could be fair to Matarranz and make a determination based solely on the evidence with the opinion that she “thought” she could — an equivocal response.[5] It was only on her last day of being skillfully questioned, after the Juror stated that she had reflected on her discussions with the court and counsel, that she concluded she could maintain an open mind during the trial. The Juror stated “anything that happened to me in the past has nothing to do with this case.” It appears that this statement and the ex *490 change surrounding it informed the trial court’s decision not to grant defense counsel’s challenge for cause. The trial court stated that
[hfcving only had heard testimony from yesterday, I would have been inclined to grant it, but her testimony from yesterday includes the fact that there had been this burglary when she was eight years old, that was emotional for her ... and today based on her demeanor, I believe from her reflection, I think she was embarrassed and she said that she thought about it last night and she said that she felt that she had more of an opened [sic] mind today and that she could be fair and she realized that that burglary that happened to her had nothing to do with this case.
Matarranz, 99 So.3d at 537 (emphasis supplied).
Although the Juror was eventually embarrassed and urged into a posture that she could distinguish her personal experiences from Matarranz’s trial, the majority of her responses — and particularly her initial reactions — raised sufficient doubt as to her ability to be impartial. Initial reactions and comments from a prospective juror offer a unique perspective into whether an individual can be fair and unbiased. Here, the Juror’s responses clearly indicated that she was- not suited to serve in this trial. It was only after skillful lawyering and questioning that the process produced a contradiction from the Juror. Which statements do we trust?
Furthermore, we have concerns with regard to any measure of impartiality that roots itself in juror “embarrassment.” Id. (“I believe from her reflection, I think she was embarrassed-”). Although the dissent has no qualms with adopting a per se rule that if sufficient pressure from the trial court and counsel yields recantation of prior expressions of personal bias, we, in contrast, harbor serious concerns for both the sanctity of the judicial process and the well-being of our civically minded public. The dissent demonstrates an unfortunate lack of experience and understanding of classic problems which have been arising during voir dire for years under the per se “recantation” rule. Any lawyer who has spent time in our courtrooms, whether civil or criminal, has experienced the frustration of prospective jurors expressing extreme bias against his or her client and then recanting upon expert questioning by the opposition, which generates such embarrassment as to produce a socially and politically correct recantation. When a juror expresses his or her unease and reservations based upon actual life experiences, as opposed to stating such attitudes in response to vague or academic questioning, it is not appropriate for the trial court to attempt to “rehabilitate” a juror into rejection of those expressions — as occurred here. At no point should prospective jurors feel compelled to reject genuine feelings regarding actual life experiences because courts or counsel have engaged in a dialogue that generates embarrassment, nor should our courts empanel jurors who maintain attitudes and feelings regarding the issue currently before the court that are anything but impartial.
Although the Juror in this case did not serve because defense counsel exercised a peremptory challenge to remove her from the jury, Matarranz was prejudiced because he had one less peremptory challenge to use against other objectionable jurors. Matarranz, therefore, was denied his right to a fair and impartial tribunal as guaranteed by the constitutions of this State and the United States.
*491 CONCLUSION
This case concerns the “the great foundation and first principle and essence of a common law trial” — a jury trial. Parsons v. Bedford, Breedlove & Robeson, 28 U.S. 438, 440, 3 Pet. 433, 7 L.Ed. 732 (1830).
[Trial by juries impartially selected is one of the components forming] the bright constellation which has gone before us, and guided our steps through an age of revolution and reformation. The wisdom of our sages, and blood of our heroes have been devoted to [its] attainment.
Thomas Jefferson, First Inaugural Address in Washington, D.C. (March 4, 1801). The most basic guarantees of the American justice system — such as due process, habeas corpus, and the presumption of innocence — fully turn upon the impartiality of our arbiters of justice. See Christopher A. Cosper, Rehabilitation of the Juror Rehabilitation Doctrine, 37 Ga. L.Rev. 1471, 1472 (2003). Here, we cannot conclude that Matarranz was judged by a fair and impartial panel based on the responses of the Juror during voir dire. Therefore, we quash the decision of the Third District, remand this case for a new trial, and approve the decision of the Fourth District in Huber v. State.
It is so ordered.
PARIENTE, QUINCE, LABARGA, and PERRY, JJ., concur.
LABARGA, J., concurs with an opinion, in which PARIENTE, LEWIS, and PERRY, JJ., concur.
CANADY, J., dissents with an opinion, in which POLSTON, C.J., concurs.

. The exchanges are transcribed exactly as they appear in the record, which includes numerous grammatical mistakes, run-on sentences, and other syntactical errors.

. The transcript is clear, however, that the defense specifically requested that the Juror be removed for cause.

. In response to the trial court's question as to whom defense counsel would use one extra peremptory challenge to strike if the court granted the request, counsel responded, "[a]t this particular point Mr. Devera would be one, Ms. Garcia, Ms. Gonzalez, juror number thirteen that is agreed, Mr. Gabriel, juror number twenty eight and Mr. Ramos juror number 46.” In response, the trial court stated "[t]he motion is denied.” All of these jurors sat on the jury, though Mr. Devera, who initially was an alternate, was later removed for cause.

.In its opinion, the Third District stated, ”[t]he trial court denied the request for an extra peremptory challenge and only one named ‘objectionable’ juror sat on the jury.” Matarranz, 99 So.3d at 538 (emphasis supplied). This Court has been unable to verify this statement. Our review of the record suggests that Matarranz would have removed four of the jurors who sat on the jury had he been given additional peremptory challenges, not just one.

. Indeed, the prosecutor responded "I think you are going to make the State nervous ... and you are going to make [defense counsel] nervous. You can’t say I think."